1  FRANK W. CHEN (State Bar No. 137079)
   fchen@FrankChenLaw.com
2  **LAW OFFICES OF FRANK W. CHEN**
   2600 Mission Street, Suite 206
3  San Marino, CA 91108
   Telephone: (626) 441-4205
4  Facsimile:  (626) 441-4352

5

6  **ROSENBERG MENDLIN & ROSEN, LLP**
   ROGER M. ROSEN (State Bar No. 120313)
7  rrosen@rmrlaw.com
   528 Colorado Avenue
8  Santa Monica, California 90401
   Telephone:  (310) 899-9008
9  Facsimile:  (310) 899-9006

10  Attorneys for Defendant Lanette Sprengel Mohr

11

12

13                 UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15

16  JEAN SPRENGEL, an individual,        CASE NO. CV-1108742 JHN SPx

17        Plaintiff,                     Assigned to the Hon. Jacqueline H. Nguyen

18        v.                             **DECLARATION OF LANETTE MOHR
                                         IN SUPPORT OF MOTION AND
19  LANETTE SPRENGEL MOHR, an            MOTION TO DISQUALIFY THOMAS
    individual, PURPOSEFUL PRESS,        R. FOLEY AS COUNSEL FOR
20  LLC, a California limited liability  PURPOSEFUL PRESS, LLC**
    company,
21                                       DATE:  MARCH 6, 2012
          Defendants.                    TIME:  2:00 PM
22                                       COURTROOM:  790

23

24

25

26

27

28

           MOHR DECLARATION RE MOTION TO DISQUALIFY

# DECLARATION OF LANETTE S. MOHR

Lanette S. Mohr declares as follows:

1.      I am one of the two Defendants in this case. I have personal knowledge of the matters set forth below and if called as a witness I would and could testify competently thereto.

2.      I am the sole manager and a 50% member of Purposeful Press, LLC, a California limited liability company. Plaintiff Jean Sprengel is the other 50% member of Purposeful Press, LLC.

3.      When we began our venture, Jean Sprengel suggested that we use the services of lawyer Kenneth Stream to help us. Kenneth Stream filed Articles of Organization for Purposeful Press, LLC. A true and correct copy of those Articles of Organization are attached hereto as Exhibit 1. The Articles of Organization state that Purposeful Press, LLC would be a one-manager limited liability company.

4.      Mr. Stream also prepared an Operating Agreement under which Jean Sprengel and I were 50-50 members of Purposeful Press, LLC. A true and correct copy of the Operating Agreement is attached as Exhibit 2. Jean Sprengel and I signed it. I was named in the Operating Agreement as the sole manager of Purposeful Press, LLC, at pages 10, 29.

5.      By mid - 2011, we had achieved over $800,000 in gross revenues for sale of the books, in three languages, sold in several countries. Over 95% of the sales have been as a result of my marketing efforts.

6.      I put in thousands of hours of effort, working full-time on Purposeful Press, LLC business. During this time, Jean Sprengel spent very little time on the business of the company, as she was employed full-time as an anesthesiologist.

7.      On or about September 15, 2011, without my knowledge or permission, Jean Sprengel withdrew $162,000 from the Purposeful Press, LLC bank account, almost all of the funds in that account. This left both Purposeful Press, LLC and me without

funds to defend litigation.  Although I am the sole manager, when we set up the bank account, we were joint signatories with equal access to the funds and online banking. This allowed her to take out the money from the company bank account.

8.    On September 16, 2011, the next day, Jean Sprengel, through lawyer Michael Kerbs, filed an action in the San Bernardino Superior Court, *Jean Sprengel v. Lanette Mohr and Purposeful Press, LLC*, Case No. CIVDS1110934, seeking involuntary dissolution of Purposeful Press, LLC, indicating her desire to end Purposeful Press, LLC.

9.    After I realized that my co-author (the books are published as "by Jean Sprengel, M.D. with Lanette Mohr) might claim that Purposeful Press, LLC did not have the right to continue to distribute the books and that she might file a lawsuit over that issue, I caused Purposeful Press., LLC to retain the services of copyright law experts.

10.    Thereafter, Purposeful Press, LLC acquired written transfers of copyright from Lingo Systems, Inc., the translator of foreign language editions of ChemoCompanion, as well as from Kara Wiley Flynn, Michelle Hoyt Simmons, and Martha Craig, the professional editors who assisted in authoring ChemoCompanion line of books.

11.    Also, Purposeful Press, LLC obtained a written exclusive license from Seven7n Design, Inc.concerning the graphic design-related components of ChemoCompanion line of books.

12.    I am informed that this has the effect of making Purposeful Press, LLC an "owner" of that portion of the copyright in the book, as "owner" is defined as a result of the definition of "transfer of ownership" in section 101 of the Copyright Act, 17 U.S.C. sec. 101.

13.    I am concerned that Mr. Foley is neither informed of nor cares to raise any of these important matters in defense of Purposeful Press, LLC in this lawsuit, nor of other meritorious defenses Purposeful Press, LLC has to Jean Sprengel's claim that she

1   is entitled to revoke the license she admits that she granted to Purposeful Press, LLC.

2      14.    Purposeful Press, LLC needs counsel who will vigorously defend its rights

3   to continue to sell the ChemCompanion books.

4      15.    Jean Sperngel has attempted to shift to me alone the legal expense to defend

5   Purposeful Press, LLC's rights to publish the ChemoCompanion line of books.  First,

6   she took virtually all of the Company's money out of its bank account, without authority,

7   in the month prior to filing this lawsuit against me, alone, in this Court, when it is the

8   Company that sells the books and that collects the revenue from same.  Third, when

9   forced in response to my motion to name Purposeful Press, LLC as a defendant, she

10  hired Thomas R. Foley to provide a sham defense to her First Amended Complaint.

11     16.    I am not familiar with the federal court system but wonder if this is how

12  justice is served in the federal courts.

13     17.    Upon learning that Thomas R. Foley filed an Answer to the First Amended

14  Complaint in this case, without my prior knowledge or approval, I wrote him a letter

15  demanding that he withdraw as counsel for Purposeful Press, LLC.  He refused to do so.

16     18.    As sole manager of Purposeful Press, LLC, I want retain counsel to

17  represent Purposeful Press LLC in this litigation and I want Mr. Foley, who is not

18  authorized to represent the Company, to be disqualified and to return any Company

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

MOHR DECLARATION RE MOTION TO DISQUALIFY

1  funds he received in connection with this matter, if he was paid any Company funds.

2         I declare under penalty of perjury of the laws of the United States of

3  America that the above is true and correct and that I signed this declaration on February

4  6 , 2012 at Clarksville, Tennessee.

5                                    _Lanette S. Mohr_

6                                    Lanette S. Mohr

17
MOTION TO DISQUALIFY

# Exhibit 1



# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of _____ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

**AUG 1 3 2008**

DEBRA BOWEN
Secretary of State

LLC-1 —File # **2 0 0 8 2 2 4 1 0 2 2 8**

## State of California
## Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**A $70.00 filing fee must accompany this form.**

**IMPORTANT – Read instructions before completing this form.**

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

AUG 0 8 2008

This Space For Filing Use Only

---

**ENTITY NAME** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1.  NAME OF LIMITED LIABILITY COMPANY

   PURPOSEFUL PRESS, LLC

**PURPOSE** (The following statement is required by statute and should not be altered.)

2.  THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**INITIAL AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3.  NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

   KENNETH B. STREAM

| 4.  IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3750 UNIVERSITY AVENUE, SUITE 250 | RIVERSIDE | CA | 92501-3335 |

**MANAGEMENT** (Check only one)

5.  THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

   [X] ONE MANAGER

   [ ] MORE THAN ONE MANAGER

   [ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

**ADDITIONAL INFORMATION**

6.  ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**EXECUTION**

7.  I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

August 6, 2008
DATE

_Lanette S. Mohr_
SIGNATURE OF ORGANIZER

LANETTE S. MOHR
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)                                                          APPROVED BY SECRETARY OF STATE

# Exhibit 2

**OPERATING AGREEMENT**

**FOR**

**PURPOSEFUL PRESS, LLC**

M864-000 -- 364107.1

# TABLE OF CONTENTS

RECITALS................................................................................................................1

ARTICLE I.  DEFINITIONS ........................................................................................1

    1.1     "Act" .............................................................................................1
    1.2     "Additional Member" .......................................................................1
    1.3     "Affiliate" ......................................................................................1
    1.4     "Agreement" .................................................................................2
    1.5     "Articles" ......................................................................................2
    1.6     "Assignee" ....................................................................................2
    1.7     "Bankruptcy" .................................................................................2
    1.8     "Capital Account" ..........................................................................2
    1.9     "Capital Contribution" ....................................................................2
    1.10    "Code" ..........................................................................................2
    1.11    "Company" ....................................................................................2
    1.12    "Corporations Code" ......................................................................2
    1.13    "Dissolution Event" ........................................................................2
    1.14    "Distributable Cash" .......................................................................3
    1.15    "Economic Interest" .......................................................................3
    1.16    "Economic Interest Owner" ............................................................3
    1.17    "Fiscal Year" .................................................................................3
    1.18    "Initial Members" ...........................................................................3
    1.19    "Majority Interest" ..........................................................................3
    1.20    "Member" ......................................................................................3
    1.21    "Membership Interest" ....................................................................3
    1.22    "Net Profits" and "Net Losses" .......................................................3
    1.23    "Percentage Interest" ....................................................................3
    1.24    "Person" ........................................................................................4
    1.25    "Regulations" ................................................................................4

ARTICLE II. ORGANIZATIONAL MATTERS ..............................................................4

    2.1     Formation .....................................................................................4
    2.2     Name ...........................................................................................4
    2.3     Term ............................................................................................4
    2.4     Office and Agent ...........................................................................4
    2.5     Addresses of the Members ............................................................4
    2.6     Purpose of Company .....................................................................4

ARTICLE III.  CAPITAL CONTRIBUTIONS ................................................................5

    3.1     Initial Capital Contributions ............................................................5
    3.2     Additional Capital Contributions .....................................................5
    3.3     Capital Accounts ...........................................................................5
    3.4     No Interest ....................................................................................5
    3.5     Loans or Services .........................................................................6

M864-000 -- 364107.1

**ARTICLE IV.  MEMBERS** ...........................................................................................................6

    4.1       Limited Liability ...............................................................................................6
    4.2       Initial Members .................................................................................................6
    4.3       Representations and Warranties ........................................................................6

          A.    Authorization ........................................................................... 6
          B.    Compliance with Other Instruments ........................................ 6
          C.    Purchase Entirely for Own Account ......................................... 6
          D.    Pre-Existing Relationship/Investment Experience .................. 6
          E.    No Advertising ........................................................................ 7

    4.4       Voting and Management Rights .........................................................................7
    4.5       Approval by Members Holding a Majority Interest. ............................................7
    4.6       Authority of Members to Bind Company ............................................................7
    4.7       Additional Members .........................................................................................7
    4.8       No Member Right to Withdrawal .......................................................................7
    4.9       Termination of Membership Interest .................................................................7
    4.10      Remuneration to Members ...............................................................................8
    4.11      Reimbursement of Expenses ...........................................................................8
    4.12      Meetings of Members ......................................................................................8

          A.    Place of Meetings of Members; Secretary ............................. 8
          B.    Annual Meetings ..................................................................... 8
          C.    Special Meetings .................................................................... 8
          D.    Notice of Meetings ................................................................. 9
          E.    Voting List. ............................................................................. 9
          F.    Quorum ................................................................................... 9
          G.    Adjourned Meeting; Notice ..................................................... 9

    4.13      Voting and Proxies ...........................................................................................9
    4.14      Action Without Meeting ....................................................................................9
    4.15      Participation by Telephone .............................................................................10
    4.16      Transactions with the Company ......................................................................10

**ARTICLE V.  MANAGEMENT OF THE COMPANY** .................................................................10

    5.1       Management ...................................................................................................10
    5.2       Authority of the Manager ................................................................................10
    5.3       Right to Rely on the Manager .........................................................................10
    5.4       Compensation of Managers ...........................................................................11
    5.5       Limitation on Liability of Manager ...................................................................11
    5.6       Indemnification of Manager ............................................................................11

**ARTICLE VI.  ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS** ...............11

    6.1       Allocations of Net Profits and Net Losses .......................................................11
    6.2       Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest ..........................................................................................................12
    6.3       Distribution of Assets by the Company ...........................................................12
    6.4       Form of Distribution ........................................................................................12
    6.5       Restriction on Distributions .............................................................................13
    6.6       Return of Distributions ....................................................................................13
    6.7       Obligations of Members to Report Allocations ................................................14

**ARTICLE VII.  TRANSFER AND ASSIGNMENT OF INTERESTS** ............................................ 14

7.1     Transfer and Assignment of Interests ........................................... 14
7.2     Further Restrictions on Transfer of Interests ............................... 14
7.3     Substitution of Members ............................................................. 14
7.4     Affiliate Transfers ...................................................................... 14
7.5     Effective Date of Permitted Transfers ........................................ 15
7.6     Rights of Legal Representatives .................................................. 15
7.7     No Effect to Transfers in Violation of Agreement ....................... 15
7.8     Right of First Negotiation ........................................................... 16
7.9     Right of First Refusal ................................................................. 16

**ARTICLE VIII.  CONSEQUENCES OF DEATH, DISSOLUTION, OR BANKRUPTCY OF MEMBER** ...... 17

8.1     Death of a Member ..................................................................... 17
8.2     Other Dissolution Events ............................................................ 17
8.3     Company's First Option to Purchase Terminated Interest ............ 17
8.4     Members' Option to Purchase Terminated Interest ..................... 17
8.5     Purchase Price ............................................................................ 18
8.6     Notice of Intent to Purchase ....................................................... 18
8.7     Election to Purchase Less Than All of the Dissolving Member's Interest ... 18
8.8     Payment of Purchase Price .......................................................... 19
8.9     Closing of Purchase of Dissolving Member's Interest ................. 19
8.10    Purchase Terms Varied by Agreemen .......................................... 19
8.11    Assumption of Obligations .......................................................... 19
8.12    Publication of Notice ................................................................... 19

**ARTICLE IX.  ACCOUNTING AND RECORDS** ........................................................... 20

9.1     Financial and Tax Reporting ....................................................... 20
9.2     Supervision; Inspection of Books ................................................ 20
9.3     Reliance on Records and Books of Account ................................. 20
9.4     Annual Reports ........................................................................... 20
9.5     Quarterly Reports ....................................................................... 20
9.6     Tax Returns ................................................................................ 21

**ARTICLE X.  DISSOLUTION AND WINDING UP** ...................................................... 21

10.1    Dissolution .................................................................................. 21
10.2    Certificate of Dissolution ........................................................... 22
10.3    Winding Up ................................................................................. 22
10.4    Distribution in Kind .................................................................... 22
10.5    Order of Payment of Liabilities Upon Dissolution ...................... 22
10.6    Compliance with Regulations ..................................................... 23
10.7    Limitations on Payments Made in Dissolution ............................ 23
10.8    Certificate of Cancellation ......................................................... 23
10.9    No Action for Dissolution ........................................................... 24

**ARTICLE XI.  INDEMNIFICATION AND INSURANCE** ................................................. 24

11.1    Indemnification of Agents ........................................................... 24
11.2    Insurance .................................................................................... 24

**ARTICLE XII.  MISCELLANEOUS** ........................................................................ **25**

12.1   Notices Between Members ........................................................ 25
12.2   Complete Agreement ................................................................. 25
12.3   Binding Effect ............................................................................ 25
12.4   Parties in Interest ..................................................................... 25
12.5   Pronouns; Statutory References .............................................. 25
12.6   Headings .................................................................................... 25
12.7   Interpretation ............................................................................ 25
12.8   Jurisdiction ................................................................................ 26
12.9   Disputed Matters ....................................................................... 26
12.10  Exhibits ..................................................................................... 26
12.11  Severability ............................................................................... 26
12.12  Additional Documents and Acts ............................................... 27
12.13  Consent and Amendments ....................................................... 27
12.14  Attorneys' Fees ......................................................................... 27
12.15  Counterparts ............................................................................. 27

**CONSENT OF SPOUSES** ............................................................................... **28**

**EXHIBIT A** ....................................................................................................... **29**

**OPERATING AGREEMENT**

**FOR**

**PURPOSEFUL PRESS, LLC**

**A CALIFORNIA LIMITED LIABILITY COMPANY**

This Operating Agreement ("Agreement") is made to be effective as of September 1, 2008, by and between JEAN E. SPRENGEL and LANETTE S. MOHR, with reference to the following facts:

**RECITALS**

WHEREAS, on August 8, 2008, Articles of Organization for PURPOSEFUL PRESS, LLC, a limited liability company under the laws of the State of California (the "Company"), were filed with the California Secretary of State; and

WHEREAS, the parties desire to adopt and approve an operating agreement for the administration and regulation of the affairs of the Company.

NOW, THEREFORE, the parties, by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

**ARTICLE I. DEFINITIONS**

When used in this Agreement, the following terms shall have the meanings set forth below:

1.1    "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

1.2    "Additional Member" shall mean a Member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

1.3    "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the

M864-000 – 364107.1

immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.4    "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.5    "Articles" shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.6    "Assignee" shall mean a transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.7    "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his/her/its consent to, the appointment of a trustee, receiver, or custodian of his/her/its other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; or (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days.

1.8    "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.9    "Capital Contribution" shall mean the total value of cash and fair market value of property (including any interest in real property, promissory notes or other obligation to contribute cash or property) contributed and/or services rendered or to be rendered to the Company by Members.

1.10   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provision of succeeding law, and to the extent applicable, the Regulations.

1.11   "Company" shall mean **PURPOSEFUL PRESS, LLC**, a California limited liability company.

1.12   "Corporations Code" shall mean the California Corporation Code, as amended from time to time, and the provisions of succeeding law.

1.13   "Dissolution Event" shall mean, with respect to any Member, one or more of the following:   the death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution, or occurrence of any other event which may terminate the continued membership of any Member.

2

1.14   "Distributable Cash" shall mean the amount of cash which the Members deem available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Members deem necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.15   "Economic Interest" shall mean Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.16   "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.17   "Fiscal Year" shall mean the Company's fiscal year, which shall mean the period from January 1 to December 31 of each year.

1.18   "Initial Members" shall mean those persons identified on Exhibit "A" hereto who have executed this Agreement.

1.19   "Majority Interest" shall mean one or more Percentage Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

1.20   "Member" shall mean each Person who (i) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles or this Agreement or is an assignee who has become a Member in accordance with Article VII and (ii) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.  The use of the term "Member" shall include both singular and plural, unless the context clearly requires otherwise.

1.21   "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs of the Company.

1.22   "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

1.23   "Percentage Interest" shall mean with respect to any Member, a fraction (expressed as a percentage), the numerator of which is the total of the Member's Capital

Contributions and the denominator of which is the total of all Capital Contributions of all Members, including Members who have made transfers to Assignees.

1.24    "Person" shall mean individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.25    "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

## ARTICLE II. ORGANIZATIONAL MATTERS

2.1    Formation.  Pursuant to the Act, the Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement.  The rights and liabilities of the Members, as well as any future Member or Members to be duly admitted, shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name.  The name of the Company shall be "**PURPOSEFUL PRESS, LLC**".  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Members deem appropriate or advisable.  The Members shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Members consider appropriate or advisable.

2.3    Term.  The term of this Agreement shall be co-terminus with the period of duration of the Company, unless sooner terminated as hereinafter provided.

2.4    Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company shall initially be located at 1703 Kyle Lane, Redlands, California 92373.  The Company also may have such offices, anywhere within and without the State of California, as the Members from time to time may determine, or the business of the Company may require.  The registered agent shall be as stated in the Articles or as otherwise determined by the Members.

2.5    Addresses of the Members.  The respective addresses of the Members are set forth on Exhibit "A."

2.6    Purpose of Company.  The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

M864-000 – 364107.1                                    4

Notwithstanding the foregoing, the Company shall initially engage in general business activities relating to the authoring, publishing and marketing of medically-related educational materials and products, and shall have the power to perform any acts in furtherance of, or related to, that business.

## ARTICLE III.  CAPITAL CONTRIBUTIONS

     3.1    <u>Initial Capital Contributions</u>.  Members, their respective addresses, their initial capital contributions to the Company, and their respective Percentage Interests in the Company are set forth on Exhibit "A", attached to this Agreement, and made a part hereof. Each Member agrees to make the initial contribution set out in Exhibit "A" within thirty (30) days of the execution of this Agreement.

     3.2    <u>Additional Capital Contributions</u>.  No Member shall be required to make any capital contribution to the Company other than the capital contributions required to be made under Section 3.1 hereinabove, absent the written agreement of all Members.  If subsequent contributions are authorized, Members shall make additional capital contributions on a pro rata basis in accordance with their respective capital accounts.

     3.3    <u>Capital Accounts</u>.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  Unless otherwise provided in such Treasury Regulation, such capital account shall be credited with (a) cash contributions to the Company by a Member; (b) the fair market value of any property contributed by a Member to the Company; (c) the amount of any liabilities of the Company that are assumed by a Member or that are secured by any of the Company's property distributed to a Member; (d) the profits of the Company allocable to a Member; and (e) the income of the Company which is not included in gross income for federal income tax purposes, allocable to a Member; and shall be debited with (f) the fair market value of the property distributed to a Member; (g) the amount of any of the Company's distributions paid to a Member; (h) the amount of any liabilities of a Member that are assumed by the Company or are secured by any property contributed by the Member to the Company; (i) the losses of the Company allocable to a Member; and (j) the Company's allocable share of expenditures of the Company described in Section 705(a)(2)(B) of the Code which are neither deductible nor chargeable to a capital account for purposes of computing Profit or Loss.  If a Member transfers all or a part of his/her/its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

     3.4    <u>No Interest</u>.  No Member shall be entitled to receive any interest on his/her/its Capital Contributions.

3.5 <u>Loans or Services</u>. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the Company. Any compensation which the Company pays to a Member for services, and any payment made by the Company to a Member on the Member's loan to the Company, shall not be treated as payment made to that Member acting in his, her, or its capacity as a Member under Internal Revenue Code Section 707.

## ARTICLE IV. MEMBERS

4.1 <u>Limited Liability</u>. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2 <u>Initial Members</u>. The Initial Members of the Company are set forth on Exhibit "A" hereto, and are admitted to the Company as Members effective contemporaneously with the execution of this Agreement. Additional members, if any, shall be admitted subject to execution of an amendment to this Agreement binding such member(s) to the terms and conditions hereof.

4.3 <u>Representations and Warranties</u>. Each Member hereby represents and warrants to the Company and each other Member as follows:

A. <u>Authorization</u>. The Member, if other than a natural person, is duly organized, validly existing, and in good standing under the law of its state of organization, and the Member has full power and authority to execute and agree to this Agreement, and to perform its obligations hereunder, and that all actions necessary for the due authorization, execution, delivery and performance by that Member of this Agreement have been duly taken;

B. <u>Compliance with Other Instruments</u>. The Members' authorization, execution, delivery, and performance of this Agreement does not conflict with any other agreement or arrangement to which such Members are a party or by which it is bound;

C. <u>Purchase Entirely for Own Account</u>. The Members are acquiring his/her/its interest in the Company for the Members' own account for investment purposes only and not with a view to or for the resale, distribution, subdivision or fractionalization thereof and has no contract, understanding, undertaking, agreement or arrangement of any kind with any Person to sell, transfer or pledge to any Person his/her/its interest or any part thereof nor does such Member have any plans to enter into any such Agreement;

D. <u>Pre-Existing Relationship/Investment Experience</u>. The Members have a pre-existing personal or business relationship with the other Members or by reason of his/her/its business or financial experience, the Members have the capacity to protect his/her/its own interest in connection with the transactions contemplated hereunder, are

M864-000 – 364107.1                                          6

able to bear the risks of an investment in the Company, and at the present time could afford a complete loss of such investment; and

        E.    No Advertising. No advertising was published with respect to any of the Membership Interest, and no promotional consideration was paid with the issuance of the Membership Interest.

    4.4    Voting and Management Rights. All Members shall be entitled to a vote on any matter submitted to a vote of the Members in accordance with Section 4.13 below. The business and affairs of the Company shall be managed by the Members of the Company. The Members acknowledge that the Members shall be permitted to delegate certain duties to the officers and other agents of the Company as provided in the Act.

    4.5    Approval by Members Holding a Majority Interest. Except as otherwise provided herein, in all matters in which a vote, approval or consent of the Members is required by the Act, or expressly provided for by this Agreement, a vote, consent or approval of a Majority Interest shall be sufficient to authorize or approve such action.

    4.6    Authority of Members to Bind Company. Only authorized agents of the Company shall have the authority to bind the Company. No Member shall have the authority to bind the Company without the consent and/or approval of the other Members, and shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

    4.7    Additional Members. No additional Members or substitute Members may be admitted to the Company as Members without the unanimous written consent of the then existing Members. Upon such consent being given, Membership Interests may be created and issued by the Members to Additional Members, Substitute Members and existing Members, as directed by the Members, upon such terms and conditions as the Members may, by unanimous written consent, direct. The terms of admission must specify the Percentage Interest, the Economic Interest and the Capital Contribution applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers and duties; provided that the Percentage Interest of an Initial Member shall not be reduced unless such Initial Member consents to such admission. Subject to the above restriction, the creation of any new class or group of Members must be reflected in an amendment to this Agreement executed by all Members.

    4.8    No Member Right to Withdrawal. No Member shall have the right to withdraw from the Company.

    4.9    Termination of Membership Interest. Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in dissolution of the Company, the Membership Interest of Member shall be terminated by the remaining Members and thereafter that Member shall be deemed an Assignee unless such Membership Interest is purchased by the Company or remaining Members as provided in Article VII. Each

Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.10    Remuneration to Members. Except as otherwise authorized in, or pursuant to this Agreement, no Member is entitled to remuneration for acting in the Company business, subject to the entitlement of the Members winding up the affairs of the Company to reasonable compensation pursuant to Section 10.3.

4.11    Reimbursement of Expenses. The Company shall indemnify the Members for payments made and personal liabilities reasonably incurred by them in the ordinary and proper course of the Company's business or for the preservation of the Company's business or property. A Member shall not be reimbursed by the Company for any of the following expenses:

A.    Attorneys' and accountants' fees for services not directly related to the Company business;

B.    Automobile expenses not related to the business activities of the Company or not approved by mutual agreement of all Members; and

C.    Entertainment and related expenses, except upon mutual agreement by the Members.

Any amounts paid hereinunder shall be treated as expenses of the Company in determining the Net Profits and Losses of the Company. Members shall submit, and Management shall retain proper documentation of all expenses reimbursed by the Company.

4.12    Meetings of Members.

A.    Place of Meetings of Members; Secretary. All meetings of Members shall be held at the principal place of business of the Company or at such other place as may be designated from time-to-time by the Members. At any Members' meeting, one (1) person shall be appointed to preside at the meeting, and one (1) person appointed to act as secretary of the meeting. The secretary of the meeting shall prepare minutes for the meeting which shall be placed in the minute books of the Company.

B.    Annual Meetings. No annual or regular meetings of the Members are required.

C.    Special Meetings. Special meetings of the Members may be called at any time by Members holding not less than fifty percent (50%) Percentage Interest in the Company. Business transacted at any special meeting of Members shall be limited to matters relating to the purposes stated in the notice of meeting.

D.   <u>Notice of Meetings</u>.  Except as otherwise provided by law, written notice for each meeting of Members, shall be given not less than ten (10), nor more than sixty (60) days before the date of the meeting to each Member entitled to vote at such meeting.  The notices of all meetings shall state the place, date and hour of the meeting.  The notice of a special meeting shall state, in addition, the purpose or purposes for which the meeting is called.  If mailed, notice is given when deposited in the United States mail postage pre-paid, directed to the Member at his/her/its address as it appears in the records of the Company.

E.   <u>Voting List</u>.  The Members calling the meeting shall prepare, at least ten (10) days before every meeting of Members, a complete list of the Members entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Member.  Such list shall be opened to the examination of any Member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, at the principal place of business.  The list shall also be produced and kept at the time and place of the meeting during the whole time of the meeting, and may be inspected by any Member who is present.

F.   <u>Quorum</u>.  A quorum shall be present at a meeting of the Members if the holder(s) of a Majority Interest are present in person or are represented by proxy.

G.   <u>Adjourned Meeting; Notice</u>.  Any meeting of Members may be adjourned to another time and to any other place at which a meeting of Members may be held under this Agreement by a Majority Interest present or represented at the meeting or by the Members.  It shall not be necessary to notify any Member of any adjournment of less than thirty (30) days if the time and place of the adjourned meeting are announced at the meeting at which adjournment is taken, unless after the adjournment a new record date is fixed for the adjourned meeting.  At the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting.

4.13   <u>Voting and Proxies</u>.  Each Member shall have a number of votes equal to his/her/its Percentage Interest.  Action on a matter is approved if it receives approval by a Majority Interest or such greater number as may be required by law, the Articles of Organization or this Agreement for the particular matter under consideration.  Each Member of record entitled to vote at a meeting of Members, or to express consent or dissent to corporate action in writing without a meeting may vote or express such consent or dissent in person or may authorize another person or persons to vote or act for him by written proxy executed by the Member or his authorized agent and delivered to the Members of the Company.  No such proxy shall be voted or acted upon after three (3) years from the date of its execution, unless the proxy expressly provides for a longer period.

4.14   <u>Action Without Meeting</u>.  Any action required or permitted to be taken at any meeting of Members of the Company may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by a Majority Interest entitled to vote on the action or such greater number as may be required

by law, the Articles of Organization, or this Agreement for the particular matter under consideration.

     4.15   <u>Participation by Telephone</u>.  Members may participate in a meeting through use of conference telephone or similar communication equipment, so long as all Members participating in such meeting can hear one another.

     4.16   <u>Transactions with the Company</u>.  Subject to any limitations set forth in this Agreement, or of the Act, and with the prior approval of the Members, a Member may lend money to and transact other business with the Company.  Subject to other applicable law, such Member has the same rights and obligations with respect thereto as if such person was not a Member.

## ARTICLE V.  MANAGEMENT OF THE COMPANY

     5.1   <u>Management</u>.  The affairs of the Company shall be managed by its Members and, initially, LANETTE S. MOHR shall act as sole Manager of the Company.  At any time when there is more than one individual who comprises the Manager, any one of the individuals may take any action permitted to be taken by the Manager.

     5.2   <u>Authority of the Manager</u>.  The Manager is authorized to:

     (a)   Keep the books and records of the Company;

     (b)   Open bank accounts in the name of the Company;

     (c)   Execute instruments and documents, including without limitation, checks, drafts, notes and other negotiable instruments, leases, and any other instruments or documents necessary, in the opinion of the Manager, to carry out the business of the Company;

     (d)   Collect rents owed to the Company and pay all obligations of the Company; and

     (e)   Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

     5.3   <u>Right to Rely on the Manager</u>.  Any person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to the identity and authority of the Manager or other person to act on behalf of the Company or any Member.

5.4   Compensation of Manager. Absent prior written agreement by the Members, no Manager shall be entitled to compensation for services performed as Manager of the Company.

5.5   Limitation on Liability of Manager. A Manager shall not be liable, responsible or accountable in damages or otherwise to the Company or the Members for any act or omission performed in good faith and in a manner reasonably believed by the Manager to be within the scope of the Manager's authority and in the best interest of the Company; provided that such act or omission did not constitute fraud, misconduct, bad faith or gross negligence.  Managers shall be fully protected in relying in good faith upon the records required to be maintained under this Agreement and upon such information, opinions, reports or statements by any of its other Members, or agents, or by any other persons who have been selected with reasonable care by or on behalf of the Company, as to matters the Manager reasonably believes are within such other person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

5.6   Indemnification of Manager.  The Company shall indemnify and hold harmless a Manager against any liability, loss, damage, cost or expense incurred by the Manager on behalf of the Company or in furtherance of the Company's interests, except where the Manager has engaged in fraud, misconduct, bad faith or gross negligence.  However, no Member shall have any personal liability for the satisfaction of any required indemnification of the Manager.

Any indemnification required to be made by the Company shall be made promptly following the fixing of the liability, loss, damage, cost or expense incurred or suffered by a final judgment of any court, settlement, agreement or otherwise.  In addition, the Company shall advance funds to a Manager claiming indemnification under this Section for legal expenses and other costs incurred as a result of a legal action brought against the Manager if (i) the legal action relates to the performance of duties or services by the Manager on behalf of the Company, (ii) the legal action is initiated by a party other than a Member, and (iii) the Manager undertakes to repay the advanced funds to the Company if it is determined that the Manager is not entitled to indemnification pursuant to the terms of this Agreement.

## ARTICLE VI.  ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1   Allocations of Net Profits and Net Losses.  The Net Profits or Net Losses of the Company shall be credited or charged, as the case may be, to the Members in proportion to their respective Percentage Interests, which shall initially be as follows:

MS64-000 – 364107.1

11

| MEMBER | ECONOMIC INTEREST |
|--------|-------------------|
| JEAN E. SPRENGEL | 50% |
| LANETTE S. MOHR | 50% |

6.2     Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.   If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day.  However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.3     Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, the Members may elect from time-to-time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

(a)     To the Members in proportion to their unreturned Capital Contributions until each Member has recovered his/her/its Capital Contributions; and

(b)     To the Members in proportion to their Economic Interests.

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor any Members shall incur any liability for making distributions in accordance with this Section 6.3.

6.4     Form of Distribution.  A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the

M864-000 -- 364107 1                              12

Company in any form other than money.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.  Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.5     Restriction on Distributions.

A.     No distribution shall be made if, after giving effect to the distribution:

(i)     The Company would not be able to pay its debts as they become due in the usual course of business.

(ii)     The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.     The Members may base a determination that a distribution is not prohibited on any of the following:

(i)     Financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances and consistently applied.

(ii)     A fair valuation.

(iii)     Any other method that is reasonable under the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

C.     A Member who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member did not act in compliance with Section 6.5 or Section 10.4.  Any Member who is so liable shall be entitled to compel contribution from (i) each other Member who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.6     Return of Distributions.  Except for distributions made in violation of the Act or this Agreement, no Member shall be obligated to return any distribution to the Company or

pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or paid by a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member.

      6.7    Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI, and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII. TRANSFER AND ASSIGNMENT OF INTERESTS

      7.1    Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his/her/its Membership Interest except with the prior written unanimous consent of the other Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the other Members may determine in their sole discretion. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement, and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

      7.2    Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his/her/its Membership Interest if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Members.

      7.3    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2, and all securities and tax requirements hereof are met, (ii) such Person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his/her/its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

      7.4    Affiliate Transfers. The Membership Interest of any Member may be transferred subject to the compliance with Section 7.2, upon consent of the Members, which shall not be unreasonably withheld, by the Member to any Affiliate of the Member; it

being agreed that in executing this Agreement, each Member has consented to such Transfers. Notwithstanding the foregoing, any Member may transfer his or her interest, without consent of the other Members, to a revocable living trust created for estate-planning purposes.

7.5     Effective Date of Permitted Transfers.  Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the date provided in Section 7.2 following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met.  The Members shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met.  Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement.

7.6     Rights of Legal Representatives  If a Member is a corporation, partnership, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his/her/its legal representative or successor.

7.7     No Effect to Transfers in Violation of Agreement.  Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to become an Economic Interest Owner, and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the Members, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Members, the transfer shall be null and void, and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred and No/100 dollars ($100.00), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership

15

Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof.

7.8     Right of First Negotiation.  If any Member desires to transfer all or any part of his/her/its Membership Interest other than pursuant to Section 7.4, such Member shall notify the Company and the other Members in writing of such desire and, for a period of thirty (30) days thereafter, the Members and the Company shall negotiate with respect to the purchase of such Member's Membership Interest.  During such period, the Member desiring to transfer such Membership Interest may not solicit a transferee for such Membership Interest.

7.9     Right of First Refusal.  Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his/her/its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.     Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the name and address of the proposed transferee, (iii) the Membership Interest to be transferred, and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.     Within thirty (30) days after receipt of the notice described in Section 7.9A, each non-transferring Member shall notify the Members in writing of his/her/its desire to purchase a portion of the Membership Interest being so transferred.  The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred.  Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the membership Interest being transferred.  In the event any Member elects to purchase none or less than all of his/her/its share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share.  If such Members fail to purchase the entire Membership Interest being transferred, the Company and then the other Members (in that order) may purchase any remaining share of such Membership Interest.

C.     Within ninety (90) days after receipt of the notice described in Section 7.9A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice.  If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Members.

M864-000 -- 364107 1

16

D.  If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3, and all securities and tax requirements hereof are met.  If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

## ARTICLE VIII.  CONSEQUENCES OF DEATH, DISSOLUTION, OR BANKRUPTCY OF MEMBER

8.1  <u>Death of a Member</u>.  Upon the death of any Member who is an initial signatory to this Agreement, the Company shall be dissolved pursuant to the provisions of Article 10 hereof.  Dissolution under this section shall involve the orderly liquidation of the Company's assets, payment of all taxes and liabilities of the Company and distribution of the remaining proceeds to the Members or to their lawful heirs or successors in interest. However, notwithstanding the foregoing, in the event that all remaining Members and all of the lawful heirs or successors of the deceased Member desire to continue the operation of the business in joint ownership, this provision may be waived by the written agreement of all such interested parties.

8.2  <u>Other Dissolution Events</u>.  Subject to the provisions of Section 8.12, upon the occurrence of a Dissolution Event as defined in Section 1.13, other than the death of an original Member, the remaining Members may, by service of a written notice stating the effective date thereof on both the Dissolving Member and the trustee in bankruptcy of the Dissolving Member, the conservator of the Dissolving Member, or receiver of such Dissolving Member, as applicable, or the judgment creditor of the Dissolving Member who has obtained a charging order against that Dissolving Member's Membership Interest, terminate the interest of the Dissolving Member in the Company.

8.3  <u>Company's First Option to Purchase Terminated Interest</u>.  Upon the termination of a Dissolving Member's Membership Interest by reason of a Dissolution Event, the remaining Members, in accordance with Section 4.9, shall have an option to cause the Company to purchase the Dissolving Member's Membership Interest in the Company by returning the Dissolving Members Capital Account balance, minus any liabilities attributed to such Dissolving Member within thirty (30) days of the Dissolution Event, or notice of the Dissolution Event.

8.4  <u>Members' Option to Purchase Terminated Interest</u>.  Should the Company choose not to exercise its option in accordance with Section 8.3, the remaining Members shall have an option to purchase, pro rata according to their existing ownership interest, the

M864-000 – 364107 1                                                                17

Dissolving Member's interest in the Company.  The remaining Members shall be given written notice of the value of the Dissolving Member's interest, determined in accordance with Section 8.5 of this Article.

    8.5   <u>Purchase Price</u>.  The purchase price for the Dissolving Member's Interest shall be the Capital Account balance of the Dissolving Member as adjusted pursuant to Section 3.3; provided, however, that if the Dissolving Member, such Dissolving Member's legal representative or the Company, deems the Capital Account balance to vary from the fair market value of the Dissolving Member's Interest by more than ten percent (10%), such party shall be entitled to require an appraisal by providing notice of the request for appraisal within thirty (30) days after the determination of the remaining Members to continue the business of the Company.   In such event, the value of the Dissolving Member's Interest shall be determined by three (3) independent appraisers, one selected by the Dissolving Member or such Dissolving Member's legal representative, one selected by the Company, and one selected by the two appraisers so named.  The fair market value of the Dissolving Member's Interest shall be the average of the two appraisals closest in amount to each other.  In the event the fair market value is determined to vary from the Capital Account balance by less than ten percent (10%), the party requesting such appraisal shall pay all expense of all the appraisals incurred by the party offering to enter into the transaction at the Capital Account valuation.  In all other events, the party requesting the appraisal shall pay one-half of such expense and the Company shall pay one-half of such expense.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Dissolving Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the remaining Members as a result of such breach.

    8.6   <u>Notice of Intent to Purchase</u>.  Within thirty (30) days after the purchase price of the Dissolving Member's Membership Interest has been determined in accordance with Section 8.5, each remaining Member shall notify the other Members, in writing, of their respective desire to purchase a portion of the Dissolving Member's Membership Interest.  The failure of any remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Dissolving Member's Membership Interest.  Each remaining Member so electing to purchase shall be entitled to purchase a portion of the Dissolving Member's Interest in the same proportion that the Percentage Interest of the remaining Member bears to the aggregate of the Percentage Interests of all of the remaining Members electing to purchase the Dissolving Member's Membership Interest.

    8.7   <u>Election to Purchase Less Than All of the Dissolving Member's Interest</u>.  If any remaining Member elects to purchase none or less than all of his/her/its pro rata share of the Dissolving Member's Membership Interest, then the remaining Members can elect to purchase more than their pro rata share.  If the remaining Members fail to purchase the entire interest of the Dissolving Member, the Company shall purchase any remaining share of the Dissolving Member's Membership Interest.

MB64-000 – 364107 1                  18

8.8    <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the remaining Members:

A.    The Company or the remaining Members shall at the closing pay in cash the total purchase price for the Dissolving Member's Interest; or

B.    The Company or the remaining Members shall pay at the closing one-fifth (1/5) of the purchase price in which case the balance of the purchase price shall then be paid in four equal annual principal installments, plus accrued interest, and shall be payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the current applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the remaining Members shall have the right to prepay in full or in part at any time without penalty.  The obligation to pay the balance due shall be evidenced by a promissory note, and if purchased by a remaining Member, secured by a pledge of the Membership Interest being purchased.

8.9    <u>Closing of Purchase of Dissolving Member's Interest</u> The closing for the sale of a Dissolving Member's Membership Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Dissolving Member or such Dissolving Member's legal representative shall deliver to the Company or the remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Dissolving Member's Interest.  The Dissolving Member or such Dissolving Member's legal representative, the Company and the remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.10    <u>Purchase Terms Varied by Agreement</u>.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

8.11    <u>Assumption of Obligations</u>.  Upon the purchase and sale of the Dissolving Member's interest under this Agreement, the remaining Members shall assume all of the Company's obligations, and shall protect and indemnify the withdrawing or terminated Member, the personal representative and estate of a deceased, insane, or incompetent member, and the property of any withdrawing, deceased, or terminated Member from liability for any such obligations with respect to such Dissolving Member's interest.

8.12    <u>Publication of Notice</u>.  Upon any purchase and sale of the former Member's interest under this Agreement, the remaining Members shall, at their own cost and expense, as soon as reasonably practicable, after giving notice of exercise of their option

MB64-000 – 364107.1                                            19

to purchase the former Member's interest, prepare, publish, and file and service all notices required by law to protect the expelled, withdrawing or terminated former Member and a personal representative of an estate of a deceased, insane, or incompetent former Member from liability for future obligations of the Company.

## ARTICLE IX. ACCOUNTING AND RECORDS

9.1    Financial and Tax Reporting.  The Company shall prepare its financial statements in accordance with generally accepted accounting principles as from time to time in effect using the accrual method of accounting on a Fiscal Year basis, and shall prepare its income tax information returns on a Fiscal Year basis, using the method of accounting required under the Code and Treasury Regulations or when one or more alternative methods are available, using the method of accounting which the Members may reasonably deem appropriate.

9.2    Supervision; Inspection of Books.  Proper and complete books of account and records of the business of the Company shall be kept under the supervision of the Members at the Company's principal office or at such other place as designated by the Members.  The Members shall give notice to each Member of any changes in the location of such books and records.  Such books and records shall be open to inspection, audit and copying by any Member, or his/her/its designated representative, upon reasonable notice at any time during business hours for any purpose reasonably related to the Member's interest in the Company.  Any information so obtained or copied shall be kept and maintained in strictest confidence except as required by law.

9.3    Reliance on Records and Books of Account.  Any Member shall be fully protected in relying in good faith upon the records and books of account of the Company and upon such information, opinions, reports or statements presented to the Company by its Members, any of its other Members, officers, employees or committees, or by any other person, as to matters the Member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.4    Annual Reports.  Upon the vote of a Majority Interest of Members, the annual financial statements of the Company shall be either audited or reviewed and reported on as of the end of each Fiscal Year.

9.5    Quarterly Reports.  Upon the vote of a Majority Interest of Members, the Members shall cause to be transmitted to the Members, within forty-five (45) days after the close of each three-month period during the Fiscal Year, a report on the affairs of the Company during such period, including an unaudited statement containing an income

statement and balance sheet of the Company during such period. Interim financial reports may also, upon the vote of a majority interest of Members, be provided to the Members on a monthly basis.

9.6    Tax Returns. The Members shall, on or before the due date prescribed by law (including any extensions of time), file, or cause to be filed, a federal income tax information return and transmit to each Member a schedule showing such Member's distributive share of the Company's taxable income, deductions and creditors, and all other information necessary for such members to timely file their Federal income tax returns. Such Member similarly shall file all appropriate state and local income tax returns or information returns on behalf of the Company. The Members shall, from time-to-time, as appropriate under Section 6654 of the Code, provide to the Members interim financial information regarding the Company so that the Members and/or the direct or indirect equity holders of any Member may timely determine their quarterly federal estimated tax obligations.

## ARTICLE X.  DISSOLUTION AND WINDING UP

10.1   Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

A.      Upon the happening of any event of dissolution specified in the Articles;

B.      Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

C.      The occurrence of a Dissolution Event and the failure of the remaining Members to consent to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the remaining Members to purchase the former Member's Interest as provided in Section 8.2 or Section 8.3;

D.      The sale of all or substantially all of the assets of the Company, except that if a consideration to be received by the Company by reason of such sale is to be received over a period of time, the Company shall not terminate until the later of the expiration of such period of time for the Company's receipt of such consideration;

E.      The written consent of a Majority Interest of the Members; or

F.      The occurrence of any other event or judicial decree which, under the laws of the State of California, would cause the termination or dissolution of a limited liability company.

10.2   Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 10.1, the Members who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

10.3   Winding Up.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Members who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be sold or distributed, and if sold, as promptly as is consistent with obtaining the fair market value thereof,  shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in Section 10.5. The Members winding up the affairs of the Company shall (i) give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company; and (ii) be entitled to reasonable compensation for such services.

10.4   Distribution in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  The fair market value of such asset shall be determined by the Members or if any Member objects by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Members or liquidating trustee and approved by a Majority Interest of Members.

10.5   Order of Payment of Liabilities Upon Dissolution.

A.   The proceeds from the liquidation of the Company's assets and collection of the Company's receivables, together with assets distributed in kind, to the extent sufficient, therefore, shall be applied and distributed in the following order:

(i)   To the expenses of liquidation, including, but not limited to, brokerage commissions from the sale of the Company's assets, escrow costs, accounting and legal fees, and other expenses related to the liquidation;

(ii)   To the liabilities and obligations of the Company to its creditors, including, subject to the applicable law, any Member who is also a creditor of the Company;

M864-000 – 364107.1                                          22

(iii)     To the creation of any reserves for contingent or unpaid claims or other purposes which the Members may deem reasonably necessary during liquidation;

(iv)     To the Members having positive balances in their Capital Accounts in accordance with the ratio of such positive balances until no Member shall have a positive capital account; and

(v)     Thereafter, in accordance with the provisions of Article VI hereof with respect to the allocation of the Company's profits.

B.     Each Member shall be liable to the Company at his/her/its termination and shall make up any deficit in his/her/its Capital Account by payments in cash to the Company equal to such deficit at the time of such termination.  The Members shall share the Company's Profits and Losses during the period of winding up and liquidation, and any gain or loss from the disposition of the Company's assets during the period of winding up and liquidation, in accordance with the provisions of Article VI hereof.

C.     The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for, if the payment has been provided for by either of the following means:

(i)     Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)     The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5C shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6     Compliance with Regulations.   All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d).

10.7     Limitations on Payments Made in Dissolution.   Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of its positive Capital Account balance and shall have no recourse for its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Members except as provided in Article XI.

10.8     Certificate of Cancellation.   The Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the

MB64-000 – 364107.1                                   23

California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9 <u>No Action for Dissolution</u>. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Members have failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his/her/its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE XI. INDEMNIFICATION AND INSURANCE

11.1 <u>Indemnification of Agents</u>. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he/she/it is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he/she/it is or was serving at the request of the Company as a Member, Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time-to-time permit. The Members shall be authorized, on behalf of the Company, to enter into indemnity agreements from time-to-time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Members deem appropriate in their business judgment.

11.2 <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

M864-000 – 364107.1

24

## ARTICLE XII.  MISCELLANEOUS

12.1    <u>Notices Between Members</u>.  All notices between the Members if there is more than one Member shall be in writing and shall be deemed duly served when personally delivered to a Member, or, in lieu of such personal service, shall be deposited in the United States mail, certified, first-class postage pre-paid, addressed to the Member at the address of the principal place of business of the Company or to the Member at the address set forth in Exhibit "A" (or at such other address as a Member may designate in writing to the Company or the Members). Notice may also be communicated by electronic mail or other electronic means, so long as receipt thereof can be verified.

12.2    <u>Complete Agreement</u>.   This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein, and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3    <u>Binding Effect</u>.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.  However, neither this Agreement nor any rights hereunder may be assigned by any Member without the prior written consent of the other Members.  Any attempt to assign this Agreement or the rights hereunder without such consent shall be void.

12.4    <u>Parties in Interest</u>.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

12.5    <u>Pronouns; Statutory References</u>.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.6    <u>Headings</u>  All headings herein are inserted only for convenience and ease of reference, and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.7    <u>Interpretation</u>. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or

MB64-000 – 364107.1                                     25

persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his/her/its counsel.

12.8    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with, this Agreement or the transactions contemplated by this Agreement, provided such claim is not submitted to arbitration or mediation pursuant to Section 12.9.   Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 12.1 of this Agreement, and that when so made shall be as if served upon it personally within the State of California.

12.9    Disputed Matters. Except as otherwise provided in this Agreement, in the event that a dispute arises between any of the Members, the Members shall seek to first mediate the dispute by informal means between themselves.  In the event that they are unable to resolve any dispute by this informal mediation, a Member may have the option to invoke the services of a third party to attempt to mediate the dispute.  Non-binding mediation is a necessary pre-condition to arbitration between the Members hereto. In the event that mediation does not resolve the dispute, the parties hereby agree to submit all controversies, claims and matters of difference between them which arise under, or are related to, the within agreement to binding arbitration in San Bernardino County, California. Arbitration may proceed in the absence of any party if written notice of the proceedings has been given to said party.   The parties agree to abide by all awards rendered in said proceedings.

To commence arbitration, the aggrieved party shall give written notice of demand for arbitration to the other party, in writing.  Any such dispute or controversy submitted to arbitration hereunder shall be decided by a single arbitrator selected by mutual agreement of the parties that are involved in the dispute.  In the event that within thirty (30) days after the demand for arbitration is received by the non-complaining party, the parties associated with the dispute cannot agree upon the selection of the arbitrator, then the arbitrator shall be a retired judge selected by the Judicial Arbitration and Mediation Services (JAMS) panel associated with the Inland Empire office of JAMS; such selection by JAMS shall occur based upon the application to JAMS by any party to the dispute. The fees of the arbitrator shall be borne equally by the parties, and the proceeding shall be administered by JAMS if a member of its panel is selected as arbitrator.   The award, judgment, decree or order, in the findings of the arbitrator shall be final, conclusive and binding upon the parties, and judgment upon the award and enforcement of any other judgment decree or order of relief granted by the arbitrator may be entered or obtained in any court of competent jurisdiction upon the application of any party to the dispute.

12.10  Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

12.11  Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this

M864-000 -- 364107.1                                           26

Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.12   <u>Additional Documents and Acts</u>.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.13   <u>Consent and Amendments</u>.  All consents and amendments to this Agreement shall be in writing and signed by all of the Members.  Signed copies of all such consents and amendments shall be filed and kept with the books of the Company.

12.14   <u>Attorneys' Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including, without limitation, reasonable attorneys' fees and expenses.  The amount of this sum shall be determined by the Court, or the arbitrator, as the case may be.

12.15   <u>Counterparts</u>.   This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall be deemed to be one and the same instrument.


IN WITNESS WHEREOF, the parties have executed this Agreement, effective as of the date written above.

JEAN E. SPRENGEL

LANETTE S. MOHR

## CONSENT OF SPOUSE

The undersigned certifies that:

1.    He is the spouse of Lanette S. Mohr, who signed the foregoing Operating Agreement and who is an initial Member of PURPOSEFUL PRESS, LLC, the limited liability company described in that Agreement (the "Company").

2.    He has read and approves the provisions of that Operating Agreement, including, but not limited to, those relating to the purchase, sale or other disposition of the interest of a deceased, retiring, withdrawing or terminating Member.

3.    He agrees to be bound by and accept those provisions of the Operating Agreement in place of all other interests that they may have in the Company, whether the interest may be community property or otherwise.

4.    His spouse shall have full power of management of her interests in the Company, including any portion of those interests that are community property, and she has the full right, without further approval, to exercise her voting rights as a Member in the Company, to execute any amendments to the Operating Agreement, and to sell, transfer, encumber, and deal in any manner with her Membership Interests, including any portion of those interests that are community property.


DATED: _30 April 2009_, 2008                    _____
                                                                        K. SCOT MOHR

M864-000 – 364107.1                    28

**<u>EXHIBIT A</u>**

**MEMBERS**

| <u>Member</u> | <u>Initial Capital Contribution</u> | <u>Percentage of Interest</u> |
|---|---|---|
| Jean E. Sprengel<br>1703 Kyle Lane<br>Redlands, CA  92373 | $5,000.00 cash | 50% |
| Lanette S. Mohr<br>318 Pasco Drive, NE<br>Renton, WA  98059 | Organizational and Business-Planning Services with an agreed-upon value of $5,000.00 | 50% |

**MANAGER**

| <u>Name</u> | <u>Address</u> |
|---|---|
| Lanette S. Mohr | 318 Pasco Dr., NE<br>Renton, WA  98059 |

M864-000 -- 364107.1

29