1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEAN SPRENGEL, | ) Case No. CV 11-08742- MWF (SPx) |
| Plaintiff, | ) **FINDINGS OF FACT AND** |
| v. | ) **CONCLUSIONS OF LAW** |
| | ) |
| LANETTE SPRENGEL MOHR, | ) |
| Defendant. | ) |
| | ) |

_____

    This matter came on for trial before the Court sitting without a jury on December 18, December 19, December 20, December 21, 2012, and January 3, 2013.  Following the presentation of evidence and argument, the parties filed supplemental briefs, after which the matter was taken under submission.

    Having carefully reviewed the record and the arguments of counsel, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I. **FINDINGS OF FACT**

1.      Plaintiff and Counterdefendant Jean Sprengel is an individual and citizen of the state of California, currently residing in Redlands, California.

2.      Defendant and Counterclaimant Lanette Sprengel Mohr is an individual and a citizen of the state of Tennessee, currently residing in Clarksville, Tennessee.

3.      Purposeful Press LLC ("Purposeful Press") is a limited liability company organized and existing under the laws of the state of California.

4.      Sprengel is a licensed anesthesiologist practicing in California.

5.      Sprengel is the President of Purposeful Press and Mohr is the Chief Operating Officer.

**A.      Sprengel Creates the Original Work**

6.      Sprengel wrote Kaye's Chemo Book when her sister, Kaye Whitney, suffered from a cancer recurrence in 2007 and underwent chemotherapy treatment.  Sprengel, and Sprengel alone, drafted the text of the Kaye's Chemo Book.  Kaye's Chemo Book included information and advice for approaching and handling chemotherapy treatment.  Kaye's Chemo Book also contained photographs taken from the Internet without permission and was therefore not publishable in its initial form.  Based on friends' reactions to Kaye's Chemo Book, Sprengel considered self-publication.

7.      In December 2007 and early 2008, Sprengel further developed Kaye's Chemo Book into a manuscript titled "Chemo Companion – A Pocket Guide" (collectively with Kaye's Chemo Book, the "Original Work").  (Exs. 246, 247, 349, 489).  Other than the title, the entirety of the Original Work was Sprengel's creation, and Sprengel was the sole author of the Original Work.  The Original Work was not created at the request of any person or entity.

8.      Mohr saw a copy of the Original Work while visiting Whitney (who is both Sprengel's sister and Mohr's cousin) and the parties discussed Sprengel's plans to publish the Original Work.  (Ex. 491).

9.      On March 17, 2008, Mohr wrote to Sprengel, proposing that she and Sprengel form a business to commercialize the Original Work.  (Ex. 350).  Mohr's initial proposal stated that Sprengel would retain all creative control.  (*Id.* at 2).  Although others approached Sprengel regarding development of the Original Work, Sprengel decided to partner with Mohr.  (Ex. 352).

10.      Mohr created an agenda of immediate business decisions while Sprengel worked on the book.  (*Id.*; Ex. 355).  In commenting on the agenda of business decisions, Sprengel stated, "I guess that my general idea was that if I could put in the money and the time to finish the book and you could put in the time to get it printed and marketed, then we could split the profit after saving some for development and business expense."  (Ex. 355 at 2).  Sprengel acknowledged that Mohr would not receive money from Purposeful Press for an extended period of time.

### B.      Creation and Marketing of Derivative Works

11.      Mohr marketed the Original Work to various potential buyers.  She secured a deal with Merck Pharmaceuticals ("Merck") through its agent, Artcraft Health ("Artcraft"), in December of 2008.  (*See* Ex. 321).  The deal was based solely on the Original Work with the understanding that Purposeful Press would produce a commercialized product for distribution.

12.      Sprengel and Mohr worked together throughout the remainder of 2008 and 2009 to create a marketable product based on the Original Work.

13.      Mohr handled the day-to-day aspects of product development, business management, and marketing.  Mohr found a printer.  Mohr located editors, graphic designers, and an accountant.  She corresponded with editors, graphic designers, and other contributors and relayed information to and from Sprengel.  Mohr worked with companies whose products were featured in the Original Work and suggested occasional replacements.  Mohr exchanged over 3,000 e-mails with graphic designer Kristie Severn. Mohr suggested inclusion of a forward.  Mohr also adjusted formatting of titles, text, and photographs.  Mohr suggested ideas for content, which she discussed with Sprengel, and

which Sprengel eventually wrote if Sprengel agreed to their inclusion. Mohr chose a single picture for inclusion into the work, at Sprengel's request. Mohr also wrote an acknowledgement paragraph, suggested inclusion of a "Laughter" section, suggested and devised chapter titles/headings, selected fonts, and proposed changes to the order of certain chapters. (*See, e.g.,* Ex. 197).

14. Mohr specifically instructed Severn and editor Martha Craig not to initiate direct communications with Sprengel out of respect for Sprengel's time. (Exs. 343, 344). As a result, Mohr was the point of contact for independent contractors on the project.

15. Mohr describes her contributions as adding to the look, feel, and tone of the finished product.

16. Sprengel approved of each of Mohr's suggestions before they were acted upon. (*See* Exs. 461, 462, 600).

17. Mohr spent hundreds of hours transforming the Original Work into a commercialized product suitable for publication.

18. Sprengel and Mohr spent many hours discussing Mohr's suggestions and Severn and Craig's contributions.

19. Sprengel revised chapters from the Original Work and wrote additional chapters. Sprengel also spent nights, weekends, and evenings reviewing Mohr's daily progress.

20. Sprengel had final say concerning all aspects of the finished product and nothing went into the work without Sprengel's ultimate approval.

21. The resulting products were the ChemoCompanion Care Guide (Ex. 161) and the ChemoCompanion Pocket Guide (collectively "Derivative Works"). (Ex.162).

22. Mohr did not write substantive (non-heading) text in the Derivative Works that differed from the Original Work. (Exs. 518, 551 at 1 ("Though I didn't personally *write* the changes, I am confident that had I not been directing this entire project, most of the editing and other changes would not have happened.)).

23.     Mohr and those with whom she communicated regularly and consistently referred to Sprengel as ***the*** author in communications about the Derivative Works.  There is no evidence that Mohr ever referred to herself as the author or an author until litigation commenced.  (*See, e.g.,* Exs. 201, 202, 203, 204, 206, 208, 209, 210, 211, 212, 213, 214, 217, 218, 220, 221).

### C.     Formation of Purposeful Press

24.     Sprengel and Mohr formed Purposeful Press to market the Derivative Works and create and sell additional derivative works based on the Original Work.

25.     Sprengel and Mohr understood at the formation of Purposeful Press that Mohr would handle day-to-day management of the company but would not make major business decisions without Sprengel's knowledge and consent.

26.     Sprengel and Mohr retained Kenneth Stream, a friend of Sprengel, as counsel to assist with the formation of Purposeful Press and to advise them with respect to intellectual property rights.

27.     Mohr prepared a book overview outline for her first meeting with Stream. (Ex. 282).

28.     Mohr met with Stream on April 8, 2008 and discussed intellectual property rights to the Original Work and the Derivative Works.  During that meeting, Stream asked Mohr whether Sprengel wanted compensation for assigning her copyright in the Original Work to Purposeful Press.  (*See* Exs. 139, 360).  Mohr and Stream also discussed the possibility for a total of six additional derivative works.  (*See id.*).  Stream did not have a background in copyright law, and it was his understanding that Purposeful Press would have intellectual property rights to the products that it was established to sell.

29.     Mohr handled a majority of the administrative tasks associated with formation of Purposeful Press.

30.     Mohr advised Sprengel that Stream would charge Purposeful Press for future copyright and trademark work in excess of his charges for drafting and advising on an operating agreement.  (Ex. 358).

31.   Stream discussed intellectual property rights again with Mohr on April 21, 2008.  (*See* Ex. 364).

32.   Stream prepared and Mohr signed Articles of Organization for Purposeful Press, which Sprengel saw only after they were filed on August 8, 2008.  (*See* Ex. 369). The Articles of Organization indicate that Purposeful Press is to be managed by one manager.  Mohr and Stream did not discuss whether the document indicated or should indicate management by Mohr to Sprengel's exclusion.  Sprengel did not raise concerns about the Articles of Organization, although she did not understand the Articles of Organization to vest Mohr with sole managerial control of Purposeful Press.

33.   In entering the business relationship with Mohr, Sprengel understood that Mohr promised to offer time and expertise while Sprengel promised to offer the raw product and initial capital.  (*See, e.g.,* Ex. 420).

34.   Stream similarly understood that Sprengel provided use of the Original Work, which Mohr was going to revamp and market.

35.   At Sprengel and Mohr's request, Stream drafted the Operating Agreement and sent it to Sprengel and Mohr for review.  Sprengel and Mohr met with Stream on April 1, 2009 to discuss the Operating Agreement and copyright registration of the Derivative Works.  (*See* Exs. 106, 381).

36.   In early April 2009, the parties discussed possible compensation in terms of hourly rates, but no formal agreement was reached.  (Ex. 383).

37.   Sprengel and Mohr executed the Operating Agreement on April 30, 2009, establishing 50/50 membership in Purposeful Press.  (Ex. 119).

38.   The Operating Agreement states that Sprengel will contribute $5,000 in capital and Mohr will contribute sweat equity valued at $5,000.  (Ex. 119).  Section 4.4 of the Operating Agreement states that Purposeful Press shall be managed by its members.  (*Id*.).  Exhibit A of the Operating Agreement lists Mohr under "MANAGER".  (*Id*.)

39.   The Operating Agreement also provides that the members will not be compensated except through equal profit distribution.  At the time of execution, Sprengel

-6-

believed this provision to require that Mohr and Sprengel each receive equal compensation from Purposeful Press, whether a payment is called a salary, a distribution, or a stipend.

40.   The parties agreed to revisit the idea of salaries once Purposeful Press made money.  Stream advised Sprengel and Mohr to reduce future agreements regarding salaries to writing.

41.   Around the time that Sprengel and Mohr executed the Operating Agreement, Mohr asked Sprengel what kind of compensation Sprengel wanted for Purposeful Press' use of the Original Work and Sprengel responded "Yeah right, with what money?  That is what the profits are for."

42.   The Operating Agreement does not address Sprengel's intellectual property rights in the Original Work or mention copyright rights, assignments, or licenses. Sprengel and Mohr never executed a written agreement concerning Purposeful Press' use of the Original Work.  There was no written assignment and there was no written license.

43.   Sprengel and Mohr again discussed the possibility of Mohr's salary on May 26, 2009, but Mohr stated that it was financially unfeasible for the company to pay her at that time.  (Ex. 393).

44.   Stream obtained a copyright registration for the Derivative Works and on June 12, 2009, transmitted it to Sprengel and Mohr.  (Exs. 110, 396).  The registration lists the claimant as Purposeful Press LLC and indicates that the Derivative Works were works for hire.  (Ex. 110).  Neither Sprengel nor Mohr expressed concern about the registrations, which listed the Derivative Works as works for hire.  The parties agree that the Derivative Works were not works for hire.

**D.   Publication of the Derivative Works**

45.   The Derivative Works were published in August 2009.

46.   Sprengel personally guaranteed the publishing line of credit with the printer, Emerald City Graphics.  (Exs. 1, 153).  The credit line was later increased, although it is

not clear whether Sprengel's personal guarantee increased proportionately with the line of credit.

47.     In addition to purchases by Merck, which totaled over $1,000,000, the Derivative Works resulted in about $10,000 in retail sales.

48.     The Derivative Works were subsequently translated into Spanish, German, and European English.  Mohr supervised the translation process.

49.     All versions of the Derivative Works state that they are "By Dr. Jean Sprengel, M.D. with Lanette Sprengel Mohr" with the exception of the German and Spanish versions, which included a translation error.  Mohr initially asked that her name be listed on the cover following "and", but Sprengel did not approve of equal billing. Mohr then requested that her name appear on the book following "with" to enable her to make marketing pitches and appearances convincingly.  (Ex. 130).  Sprengel agreed to Mohr's later request.  The translation errors implying equal authorship were extremely upsetting to Sprengel.

50.     In May 2010, Sprengel and Mohr agreed that Mohr would receive $30,000 from Purposeful Press' profits, and Mohr received a check from Purposeful Press for $30,000 a little over one month later.  (Exs. 405, 406).   At the time, Mohr proposed taking another $30,000 from Purposeful Press' profits when the company received another large order from Merck.  Sprengel did not respond contemporaneously to Mohr's request for a second payment.

### E.     Creation of the ChemoCompanion Caregiver Guide

51.     Sprengel believed that a guide for caregivers would be a useful addition to the ChemoCompanion series.  Sprengel and Mohr subsequently discussed co-authorship of a caregiver guide and drafted a rough outline, although Sprengel expressed concerns about divergent voices resulting from shared writing.  Sprengel and Mohr initially understood that they would each write certain chapters of the book.  Sprengel drafted a formal outline of a caregiver guide and sent it to Mohr.

52.    In September 2010, Sprengel requested $9,000 and reported 90 hours of work at $100 per hour during a week that she worked in part on an outline for the caregiver guide.  (Ex. 409).  Mohr wrote Sprengel a check for $10,000.  (Ex. 416).  The parties understood the $10,000 check to be compensation for more than just Sprengel's work on the caregiver guide.

53.    Sprengel constructed a full outline, conducted research, and began writing certain of the planned chapters.  Mohr did not draft any chapters intended for inclusion in the caregiver guide.

## F.    Difficulties Arise Between the Parties

54.    Mohr's responsibilities at Purposeful Press included the preparation of regular, accurate, financial reports.  (*See* Ex. 218).   Mohr did not send Sprengel regular financial statements, although Sprengel had the ability to view Purposeful Press' online bank statements.

55.    On November 5, 2010, Sprengel e-mailed Mohr after noticing that Purposeful Press' bank account balance had declined by about $100,000.  (Exs. 215, 417).  Mohr responded that the decline was due to payment of debts and payment of what Mohr considered to be the second installment of her salary for 2009, a $30,000 withdrawal.  (Ex. 417).  Sprengel responded that she and Mohr needed to work out a way to compensate Sprengel as well.  (*Id*.).

56.    In late November 2010, Sprengel and Mohr began to disagree about Purposeful Press' finances and Mohr's compensation.

57.    On November 26, 2010, Mohr expressed an understanding that the 50/50 profit sharing provided by the Operating Agreement was to occur after Mohr was paid a salary of $60,000 per year.  (Ex. 348).  Sprengel did not share that understanding and considered the payment to be an advance on any profit sharing that was to occur.  Sprengel also objected to the fact that Mohr expected a retroactive salary for 2009 in addition to a salary for 2010.  Mohr proposed that Sprengel track hours she worked so that Sprengel could receive hourly compensation prior to profit sharing.  (*Id.*).

58.     Mohr e-mailed Sprengel on November 29, 2010, suggesting the use of consultant Stephen Nelson to assist in resolving the dispute and withdrawing her intention to co-author the caregiver guide.  (Ex. 420).  Mohr utilized Stephen Nelson in an attempt to ascertain the industry standard for compensation.  (Ex.113).  Nelson suggested that Mohr receive a salary, Sprengel receive 8% royalty, and Mohr and Sprengel split the remaining profits 50/50.  (*Id.*).

59.     Sprengel and Mohr exchanged additional e-mails discussing their divergent views of appropriate compensation and resolution of the dispute.  (Exs. 218, 569).

60.     Mohr sent Sprengel a letter on December 5, 2010, stating that she could not continue to manage Purposeful Press if she was denied a salary.  (Ex. 187).  She enclosed a check for $50,000 in order to equalize payment between the parties and attached a summary of Purposeful Press' accounts.  (*Id.*).  Sprengel and Mohr each received $60,000 in payments from Purposeful Press in 2010.  (*See* Ex. 122).

61.     Sprengel responded by e-mail on December 8, 2010 stating that she would take over Mohr's managerial duties.  (Ex. 306).

62.     Sprengel sent Stream an e-mail on December 8, 2010 to discuss the letter from Mohr.  (Ex. 423).  Sprengel expressed that she would be willing to either dissolve Purposeful Press or buy Mohr out of the business.  (*Id.*).

63.     On December 10, 2010, Sprengel communicated via telephone and e-mail with employees of Artcraft to discuss the possibility of a future visit to Artcraft's facility.  (Ex. 424).

64.     Mohr e-mailed Sprengel Purposeful Press' year-end financial projections on December 12, 2010.  (Ex. 55).

65.     Counsel for Sprengel, William Ward, wrote a letter on January 21, 2011 to Mohr, advising her that Sprengel retained counsel and requesting that Mohr maintain the status quo of Purposeful Press.  (Ex. 570).

66.     Counsel for Mohr responded stating that Mohr was the sole manager of Purposeful Press.  (Ex. 571).  This was the first time either Mohr or her counsel asserted

that she was the sole manager of Purposeful Press to the exclusion of Sprengel.  This was also the first time that Mohr claimed to be an author of the Derivative Works with reference to copyright ownership.

67.  Sprengel communicated directly with Artcraft in March 2011 regarding the caregiver guide.  (Ex. 424).

68.  Mohr's counsel wrote Sprengel on March 7, 2011, stating that Sprengel's communication with Artcraft was a violation of both the Operating Agreement and Mohr's prior acquiescence to Sprengel's standstill demand.  (Exs. 186, 431).  Mohr offered to discontinue her request for a salary and receive compensation by way of 50/50 profit sharing, contingent on Mohr's sole management of Purposeful Press.  (Ex. 186). Sprengel did not agree to Mohr's offer.

69.  After March 7, 2010, Mohr began to exclude Sprengel from discussions regarding the business operations of Purposeful Press.

70.  Mohr used Purposeful Press' funds to pay for some legal and accounting services in connection with the dispute with Sprengel.

71.  Sprengel sent Mohr a "Notice of Rescission" on March 14, 2011.  (Ex. 179).

72.  Sprengel discontinued work on the caregiver guide following the Notice of Recission.

73.  After March 14, 2011, Purposeful Press continued to create, publish, and sell the Derivative Works.  During that time, Mohr communicated directly with Merck regarding an exclusive agreement.  (*See, e.g.,* Ex. 133).

74.  In April 2011, Mohr retained a consultant for Purposeful Press without Sprengel's knowledge or consent.  Mohr requested that the consultant, Howard Fisher, bill Purposeful Press in small increments of time.  (Ex. 127).

75.  In June 2011, Mohr renewed her request to forego a salary and dropped all requested conditions for sole control of Purposeful Press.  (Ex. 444).  Sprengel did not agree to Mohr's offer.

### G.     Litigation Commences in Federal and State Court

76.     On September 15, 2011, Sprengel transferred $162,000 from Purposeful Press' bank account into her personal checking account and then into her attorney's client trust account.  Sprengel also initiated a lawsuit for dissolution of Purposeful Press in the Superior Court of California, County of San Bernardino.  Sprengel filed a copyright registration on the same day for the Original Work, U.S. Copyright Registration No. TX 418-189.  (Exs. 175, 176).

77.     On September 26, 2011, Mohr e-mailed Craig a written scope of work for a caregiver guide.  (Ex. 184).  Mohr did not consult Sprengel regarding Craigs's hiring or the scope of work.  Sprengel did not authorize further development of the existing caregiver guide by editors or graphic designers.

78.     Counsel for Sprengel sent Mohr's counsel a letter on September 30, 2011, expressing Sprengel's intention to revoke any implied license to exploit the Original Work.  (Ex. 29).

79.     On October 14, 2011, Mohr filed copyright registrations for the Derivative Works, listing Sprengel, Mohr, Craig, Severn, Seve7 Design, Simmons, and Carol Wiley Flynn as authors on behalf of three claimants, Sprengel, Mohr, and Purposeful Press.  (Exs. 487, 488).  Sprengel was unaware of this filing until December 2012.

80.     Sprengel filed the current copyright infringement action in this Court on October 21, 2011.

81.     During 2011, Mohr used portions of the Derivative Works to create a ChemoCompanion Excerpt Guide.  (Exs. 7, 298, 507).  Sprengel did not authorize its creation, nor was she aware of its creation at the time.  There are twelve copies in existence.

82.     Mohr also engaged a writer, Kerry Clark, to work on Mohr's version of a caregiver guide on or around November 2011.  (Ex. 183).  Mohr did not consult Sprengel regarding Clark's hiring or work.  Mohr testified that Clark's outline was completely different from Sprengel's and that Clark's name was to appear on the final product.

83.     Mohr engaged Craig as an editor to work on Mohr's version of a caregiver guide on or around November 2011.  (Ex. 184).  Mohr did not consult Sprengel regarding Craigs's retention.

84.     Mohr also engaged Craig to work on a men's guide without consulting Sprengel or receiving Sprengel's approval.  (Ex. 12).

85.     Counsel for Sprengel continued to communicate her intention to revoke any copyright rights that were conveyed during the establishment of Purposeful Press and creation of the Derivative Works.

86.     Mohr retained counsel for Purposeful Press in this matter, Mr. Cox, and Mr. Cox remained involved, albeit in a limited capacity, even after the Court's May 30, 2012 Order.

87.     Mohr, through Gregory Zbylut, filed a form with the California Secretary of State's Office on May 18, 2012, listing Zyblut as Purposeful Press' agent for service of process and Mohr as the signee.  (Ex. 317).  The form also lists the street address of the principal executive office as Mohr's address in Tennessee.  (*Id.*).  Sprengel was unaware of the existence of this form at the time and did not authorize its filing.

## II. **PRIOR ORDERS**

The Court ruled on May 30, 2012 that Purposeful Press need not actively participate in this litigation, disqualifying counsel hired by Sprengel on Purposeful Press' behalf; the Court found that neither Sprengel nor Mohr could be trusted to retain independent counsel to provide Purposeful Press with neutral representation in this matter because Purposeful Press did not appear to have any interests independent of its two members.  (Docket No. 47).

On September 24, 2012, the Court issued a ruling on Sprengel's Motion for Partial Summary Judgment of Copyright Infringement.  (Docket No. 84).  The Court granted the motion in part and denied the motion in part.  (*Id.*).  The Court ruled that Sprengel established a *prima facie* case of copyright infringement as a matter of law as to the Derivative Works but was not entitled to summary adjudication of Mohr's affirmative

defenses.  (*Id.*).  The Court also ruled that the erroneous copyright registration filed by Purposeful Press, LLC, U.S. Copyright Registration No. TX 6-925-939, was ineffective.  (*Id.*).

Prior to trial, the Court denied Sprengel's Motion in Limine seeking to preclude Mohr's reliance on evidence purportedly barred by the parol evidence rule.  (Docket No. 147).  The Court held that Mohr identified a latent ambiguity in Purposeful Press' Operating Agreement justifying the introduction of extrinsic evidence as to the implied license.  (*Id.*).

### III.   CONCLUSIONS OF LAW

The issues in this case are largely tied to the Court's determination of who owns the intellectual property in question.  This determination turns on the scope and revocability of the implied license to exploit the Original Work, as well as Mohr's stake, if any, in the intellectual property rights to the Derivative Works.

Sprengel claims that Mohr's continued publication of the Derivative Works following Sprengel's purported revocation of the implied license willfully and deliberately infringed Sprengel's copyright in the Original Work, entitling Sprengel to damages, an injunction, and a claim for violation of California Business & Professional Code §§ 17200 *et seq.*  Sprengel also seeks a declaratory judgment that she is the sole author of the Derivative Works.  Mohr seeks declaratory judgments that Mohr has not infringed on Sprengel's copyright in the Original Work, that Purposeful Press has a license to publish additional derivative works, including a caregiver guide, and that Mohr is a joint author of the Derivative Works.

### A. The Implied, Nonexclusive License

The existence of a license is an affirmative defense to a claim of copyright infringement and the burden of proof is ultimately on the party seeking to avoid infringement liability.  *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).  Implied licenses are creatures of law, not equity. *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990) ("Plaintiff cites no

authority for the proposition that an implied license is equitable in nature; it seems to us to be a creature of law, much like any other implied-in-fact contract.").

In the Ninth Circuit, an implied, nonexclusive license for an unspecified duration is subject to 17 U.S.C § 203(a) and is irrevocable until the final five years of a thirty-five year default license period. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993). If the grant of a license is not supported by consideration, the license is revocable at will; conversely, if the grant of a license is supported by consideration, it is irrevocable for the period set forth in 17 U.S.C § 203(a). *See UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.,* 446 F. Supp. 2d 1164, 1178 (E.D. Cal. 2006) ("because the implied license here is supported by consideration, it is irrevocable."); *Ortiz v. Guitian Music Bros., Inc.*, 2009 WL 2252107, at * 3 (S.D.N.Y. July 28, 2009) ("Indeed, absent consideration, nonexclusive licenses are revocable."); *Nearstar, Inc. v. Waggoner*, 2011 WL 817374, at *4 (E.D. Tex. Mar. 2, 2011) (license is revocable without specific consideration for the grant of a license); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (Matthew Bender rev. ed. 2011) ("It remains true that nonexclusive licenses are revocable absent consideration . . . . . It therefore follows that they are irrevocable if supported by consideration."); *cf. Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) ("If an implied license accompanied by consideration were revocable at will, the contract would be illusory.").  Nonexclusive implied licenses supported by consideration are irrevocable even where the licensor and licensee have a written contract defining other terms of their relationship. *See Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001).

State law dictates the sufficiency of consideration to support a finding of an implied license. *See, e.g., Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003) (applying Texas law to determine adequacy of consideration for implied copyright license).  Under California law, adequate consideration is "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than

such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor ." Cal. Civ. Code § 1605; *see also* Williston on Contracts § 7:4 (4th ed. 2008) ("Neither the benefit to the promisor nor the detriment to the promisee need be actual; rather, it is a sufficient legal detriment to the promisee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise."). A promise may also constitute sufficient consideration for several counterpromises. *See Martin v. World Sav. and Loan Ass'n*, 92 Cal. App. 4th 803, 808, 112 Cal. Rptr. 2d 225 (2001) (underlying mortgage loan served as consideration for the additional promise that lender must be named loss payee for earthquake insurance).

Even if a nonexclusive implied license is subject to the 17 U.S.C § 203(a), it may be revoked by the licensor if the licensee materially breaches the licensing agreement. *Rano v. Sipa Press, Inc.*, 987 F.2d at 586. The licensor's right of revocation only arises if the breach "is of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties." *Id.* (citation and quotation omitted, alterations in original). In other words, a material breach giving rise to the right of revocation "must constitute a total failure in the performance of the contract." *Id.* (citation and quotation omitted); *see also Lizalde v. Advanced Planning Services, Inc.*, 2012 WL 2374882, at *11 (S.D. Cal. June 22, 2012) (finding properly pleaded material breach of implied license where licensee failed to pay sales commissions).

### B. Authorship of a Joint Work

A claim for authorship of a joint work requires that the purported co-author make an independently copyrightable contribution to the disputed work and satisfy the statutory criteria to be deemed an "author" within the meaning of 17 U.S.C. §101. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231-32 (9th Cir. 2000). In the absence of an authorship contract, courts determine "authorship" within the meaning of 17 U.S.C. §101 by reference to three criteria: (1) superintendence by exercise of control; (2) objective manifestation of intent to be co-authors; and (3) audience appeal that turns on inextricably intertwined

contributions. *Id.* at 1234. The Ninth Circuit has observed that an author is usually "the inventive or master mind who creates, or gives effect to the idea" and noted that control is usually the most important factor in evaluating authorship. *Id.*

## IV.   APPLICATION OF LAW TO FACTS

### A. The Implied, Nonexclusive License

#### 1. *The Scope of the License*

The parties do not dispute that Sprengel granted Purposeful Press an implied license to use aspects of the Original Work in the Derivative Works. Nor do the parties dispute that the Derivative Works conformed to the implied license Sprengel granted when they were initially published. The first question instead concerns the scope of the license Sprengel granted. The Court holds that Sprengel granted an implied, nonexclusive license to Purposeful Press (1) to exploit the Original Work by publishing and selling the Derivative Works and (2) to develop additional derivative works based on the Original Work with Sprengel's approval.

While it is a close question further complicated by a series of contingencies, Sprengel, Mohr, and Stream's testimony supports a finding that Sprengel intended the Original Work to serve as a springboard for additional derivative works (a caregiver guide, a men's guide, a Christian guide, among others) if developed in the same manner as the Derivative Works. However, these were nascent projects at the time the license was granted. The caregiver guide, men's guide, Christian guide, and others were inchoate products that were contemplated but not yet realized. The evidence shows that in spite of the hypothetical nature of the projects, conditioned on the economic success of the Derivative Works, the parties intended their creation to approximate the process of developing the Derivative Works – Mohr would continue to manage the day-to-day aspects of the business, contributors could be hired on an as-needed contract basis, and Sprengel would retain final creative veto.

It is not entirely clear based on the evidence before the Court how the license would have been impacted by the amicable retirement or untimely death of one of the parties.

But it is clear that the parties did not intend for Mohr or Purposeful Press to exploit the Original Work by creating further derivative works over Sprengel's objection.  And without Sprengel's endorsement (or at least in the face of Sprengel's protests), the fact that Sprengel granted Purposeful Press a license to use the Original Work in the Derivative Works does not permit Purposeful Press to use the Original Work to create other products.  *See, e.g., Oddo v. Ries*, 743 F.2d 630, 632 (9th Cir. 1984) ("[T]he implied license to use the articles in the manuscript does not give Ries or the partnership the right to use the articles in any work other than the manuscript itself.").  To find otherwise would allow Mohr, through Purposeful Press, to exploit Sprengel's Original Work in unanticipated and likely unappreciated ways.  The parties' testimony and course of dealings show that further exploitation of the Original Work to create a caregiver guide, a men's guide, a Christian guide, or other new works was not proper if Sprengel opposed the use, as she does now.

## 2. *Revocability*

Sprengel granted the implied license at the formation of Purposeful Press in exchange for valuable consideration.  (*See* Exs. 420, 464).  Sprengel and Mohr embarked on a business venture together, envisioning joint contributions that they considered to be equal at Purposeful Press' formation.  Sprengel promised to contribute the product and the initial capital.  Mohr promised to contribute time and expertise to market and polish the product, turning it into commercially viable merchandise for distribution and sale.  The parties memorialized certain, but not all, of these contributions in Exhibit A of the Operating Agreement.  (Ex. 119).  Pursuant to the Operating Agreement, Sprengel provided $5,000 in cash and Mohr provided "[o]rganizational and [b]usiness-[p]lanning [s]ervices with an agreed-upon value of $5,000.00."  (*Id*. at 34).  In exchange for these contributions, Sprengel and Mohr each received 50% interest in Purposeful Press.

The Operating Agreement is silent as to Sprengel's contribution of a license.  The Operating Agreement is also silent as to Mohr's contribution of organizational and business-planning services *in excess* of $5,000.  Yet the structure and point of Purposeful

Press would be rendered meaningless without either.  The central purpose of the enterprise revolved around both the license and Mohr's continued management of the company.  The parties intended that Sprengel would allow the Original Work to be exploited and that Mohr would continue in her managerial role after she rendered services worth $5,000.  Sprengel in fact allowed the Original Work to be turned into the Derivative Works, and Mohr in fact continued in her managerial role after she rendered services worth $5,000, working hundreds of hours on the Derivative Works.  This exchange of promises offered and performed provides sufficient and valuable consideration for the license's grant.  *See* Cal. Civ. Code § 1605; *see also* Williston on Contracts § 7:4 (4th ed. 2008).

Additionally, because the enterprise would be of minimal value without the grant of the license, each of Mohr's contributions to Purposeful Press can be understood as being promised in exchange for Sprengel's financial and intellectual property contributions.  *See Martin*, 92 Cal. App. 4th at 808 (under California law, a promise may be offered as consideration for several counterpromises); *Foad Consulting Group*, 270 F.3d at 828 (nonexclusive implied license may be supported by consideration even when the parties have an express contract that does not specifically address the license).  Whether exchanged specifically for the unaccounted-for promise of services in excess of $5,000 or as part of the gestalt of Purposeful Press' formation, Sprengel received valuable consideration for the grant of the implied license.  *See generally Asset Mktg. Sys.*, 542 F.3d 748 (payment for development of software programs constituted consideration rendering license irrevocable).  Because the license was supported by valuable consideration, it is subject to 17 U.S.C § 203(a) and is irrevocable until the final five years of a thirty-five year default license period.  *Rano*, 987 F.2d at 585.

Although both parties may have acted in violation of the Operating Agreement, Mohr's conduct did not constitute a material breach of the license agreement such that Sprengel's right of revocation sprang into existence.  Here, the object of the parties was to develop and sell the Derivative Works based on the Original Work, and possibly develop additional derivative works should their enterprise prove fruitful.  Thanks to the creativity

of Sprengel and the tireless marketing and managerial efforts of Mohr, Purposeful Press developed and sold the Derivative Works with remarkable success.  Sprengel retained complete creative control over the development of the Derivative Works and consistently expressed satisfaction with the final products.  To conclude that there was a total failure of consideration or a miscarriage of the parties' goals for establishing the license would be a gross mischaracterization of the parties' history.

After the dispute arose in November 2010, Mohr continued to manage Purposeful Press as promised and attempted to salvage what she could of both the company and her relationship with Sprengel.  Whether her efforts represented deviations from the Operating Agreement is not before this Court, as her conduct must instead represent a total failure of performance in order to give rise to Sprengel's revocation right.  *Rano*, 987 F.2d at 586; *see also Oddo*, 743 F.2d at 634 (violation of California partnership law does not transform proper use of copyright into infringement under federal law); *see also Fireman's Fund Ins. Co. v. Sizzler USA Real Property*, 169 Cal. App. 4th 415, 86 Cal. Rptr. 3d 715 (2008) (partial breach of agreement does not constitute total failure of consideration if it does not go to the meaning of the agreement).  Mohr did not entirely fail to perform her end of the bargain with regard to the implied license because she rendered managerial services far in excess of $5,000 long before the dispute arose and the purpose of the license was ultimately effectuated.  Sprengel's right of revocation therefore never came into existence and Sprengel's attempts to revoke the implied license are void.

The fact that Mohr embarked on the creation of derivative works without Sprengel's involvement may very well constitute a breach of the implied, nonexclusive license without constituting a material breach.  However, since the unauthorized derivative works were not actually published or marketed, the Court does not consider partial creation to undermine the very essence of the parties' broad agreement.  And because Sprengel did not put forth a damages claim or damages evidence for breach of the implied license based on Mohr's creation of the unauthorized works, and the Court cannot determine that this potential breach is or would have been actionable.  (*See* Proposed

Final Pretrial Conference Order at 4-6 (Docket No. 117-1)).  Accordingly the implied, nonexclusive license was not revoked because it was not revocable.  Moreover, Mohr's actions in that regard also seem consistent with the role that she played at Purposeful Press.  None of the works would have been published or successfully marketed if the parties had relied on the initiative of Sprengel.

The Court rules in favor of Mohr's affirmative defense to copyright infringement, based on the existence of an implied, nonexclusive license.  Neither Mohr nor Purposeful Press infringed Sprengel's intellectual property rights in the Original Work by continuing to publish and sell the Derivative Works after this dispute arose.  Purposeful Press may continue to sell the Derivative Works as they currently exist (including extant translations) until Sprengel's right of revocation arises and Sprengel properly revokes the license.  Purposeful Press may also develop additional derivative works that incorporate protected elements of the Original Work, but only to the extent that said development occurs with Sprengel's approval.  (Obviously, the value of the license depends on the future fate of Purposeful Press, which is a matter for the San Bernardino Superior Court.)

The Court need not address Mohr's equitable affirmative defenses because the existence of the implied license absolves Mohr and Purposeful Press of liability for copyright infringement with regard to the Derivative Works.  And because the implied, nonexclusive license was not terminated, the Court need not address the propriety or applicability of the Derivative Works Exception.

**B. Authorship of a Joint Work**

There is no evidence that Sprengel and Mohr entered into a binding contract for authorship, so the factors laid out in *Aalmuhammed* control here.  *Aalmuhammed*, 202 F.3d at 1231-32.  The Court rules that Mohr is not an author of the Derivative Works. Sprengel is the sole author of the Derivative Works under both elements of *Aalmuhammed*:

***First,*** Mohr cannot be a joint author because her contributions to the Derivative Works are not independently copyrightable.  *Ashton-Tate Corp. v. Ross*, 916 F.2d 516,

521 (9th Cir. 1990) ("[O]ur circuit holds that joint authorship requires each author to make an independently copyrightable contribution").  Mohr agreed that she did not write any of the substantive text in the Derivative Works that differed from the Original Work.  Mohr's remaining contributions of titles, slogans, typographic ornamentation, lettering, coloring, and ideas (as distinguished from the manner in which the ideas are expressed) are excepted from copyright protection pursuant to federal law.  37 C.F.R. § 202.1.  Mohr's contributions, while significant, were essentially editorial in nature and did not rise to the level of independently copyrightable expression.

*Second*, even if Mohr's contributions were independently copyrightable, Mohr is not an "author" within the meaning of 17 U.S.C. §101 because each factor articulated in *Aalmuhammed* weighs against a finding of joint authorship.

The first and most significant of the *Aalmuhammed* factors – control – strongly suggests that Sprengel is the sole author of the Derivative Works.  Sprengel and Mohr testified unequivocally that Sprengel had the final word on all decisions with respect to the Derivative Works.  Sprengel and Mohr discussed their disagreements and sometimes convinced each other of the wisdom of their respective positions, but ultimately Sprengel was the creative force superintending the development of the Derivative Works and exercising definitive control over the product.  Mohr's suggestions and proposals were just that – ideas Mohr offered in an attempt to improve the Derivative Works that Sprengel was free to either accept or reject.  Consequently, Mohr lacked authoritative control over the Derivative Works, and "absence of control is strong evidence of the absence of co-authorship." *Aalmuhammed*, 202 F.3d at 1235.

Neither party objectively manifested an intent to be considered coauthors.  Sprengel refused Mohr's request for equal billing (connecting their names with "and" on the covers) and expressed anger and disapproval when translations mistakenly implied co-authorship.  Even Mohr's proposal that her name appear after "with" was justified not by virtue of her contribution, but with an eye toward effective marketing.  Importantly, Mohr consistently referred to Sprengel as ***the*** author in communications with others regarding

the Derivative Works.  The Court is not aware of a single instance in which Mohr referred to herself as *an* author or used the nonexclusive "*an*" in reference to Sprengel's status as author.

And while there is evidence that Mohr's contributions were well-received, there is stronger evidence that the commercial appeal of the Derivative Works turned on the content taken from and inspired by Sprengel's Original Work.  A significant majority of the Derivative Works' sales came from a deal with Merck that was reached after Merck's agents saw the Original Work, and only the Original Work.  Although Merck was undoubtedly happy to receive a polished, commercialized product that included catchy headings and slogans, there is no indication that those aspects of the Derivative Works had any impact on the decision to buy them in bulk and distribute them to patients.  Merck's expressed interest based on the Original Work undermines a conclusion to the contrary.

Accordingly, the Court rules that Sprengel is the sole author of the Derivative Works.  This conclusion is not meant to minimize the contributions that Mohr made to the commercial success of the LLC, in particular the contract with Merck.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V. **VERDICT**

The Court finds and rules as follows:

1.  In favor of Defendant as to Plaintiff's claims for copyright infringement and unfair competition;

2.  In favor of Plaintiff as to Plaintiff's claim for declaratory judgment of sole authorship of the Derivative Works;

3.  In favor of Defendant as to Defendant's claim for declaratory judgment of non-infringement;

4.  In favor of Plaintiff on Defendant's claim for declaratory judgment that Purposeful Press has a license to publish additional derivative works (including a derivative caregiver guide) without Sprengel's approval; and

5.  In favor of Plaintiff on Defendant's claim for declaratory judgment that Mohr is a joint author of the Derivative Works.

The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 54 and 58(b).

Dated:  February 21, 2013

_____
MICHAEL W. FITZGERALD
United States District Judge